IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LINDA GOETZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-cv-3283 |
| | ) | |
| THE CITY OF SPRINGFIELD, ILLINOIS, | ) | |
| a municipal corporation, GREG SEIPEL, | ) | |
| JAY C. BARTLETT, TODD RENFROW, | ) | |
| and TIMOTHY DAVLIN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Motion for Summary Judgment.

The Defendants are granted summary judgment on all claims,

except the Section 1983 due process claims against Mayor Timothy

Davlin and Todd Renfrow.

# I. BACKGROUND

## A. FACTUAL BACKGROUND

The City of Springfield, Illinois ("City") operates a municipal

electric and water utility operated through the Office of Public Utilities ("Utility"). The Plaintiff, Linda Goetz, was hired by the City in April 1998. Prior to working for the City, the Plaintiff had 18 years of experience as an electric power marketer.

The Plaintiff began as an electric power marketer with the City, but a short time later was reclassified as a Project Manager. The Plaintiff was responsible for managing the Utility's key accounts. She interfaced with the Utility's largest clients and helped potential Utility customers get annexed into the City.

From 1998 until 2005, the Plaintiff worked in a private office in the Utility's headquarters at the Municipal Center East in downtown Springfield. Starting in January 2004, the Plaintiff worked on the Springfield Green initiative in addition to her key account responsibilities.[1] The Plaintiff felt she was getting mixed signals regarding whether key accounts or Springfield Green should take priority.

---

[1] Springfield Green was an initiative by Mayor Timothy Davlin to beautify the City. Mayor Davlin delegated leadership of the project to Todd Renfrow, General Manager of the Utility.

In February 2005, the Plaintiff's Springfield Green duties were taken over by another City employee. The Plaintiff was told she did a good job, but that the Utility needed her to focus all of her efforts on key accounts.

At the same time, the Plaintiff was assigned to work at the Utility's facility located at the corner of 10th and Miller Streets. The Plaintiff was supervised at the 10th and Miller Street facility by Michael Workman, although she had previously reported directly to Jay Bartlett, the Utility's Chief Engineer. Workman had 27 years of utility experience, and was responsible for coordinating between the engineering, construction, and operations units of the Utility. He had previously managed the Utility's Commercial Office. Like the Plaintiff, Workman was also a Project Manager.

The reason for moving the Plaintiff to the Utility's transmission and distribution facility at 10th and Miller Street was to allow her to gain more exposure to the operational side of the Utility. Utility leaders believed this exposure would make her more effective in dealing with key accounts.

There was a great deal of tension between Workman and the Plaintiff. While the Plaintiff had worked independently for years, Workman supervised her work at a very detailed level. Workman preferred to interact with subordinates by email and insisted on reviewing all outgoing correspondence. Workman believed that the Plaintiff had bypassed him in dealing with Utility managers, so he forbade the Plaintiff from contacting Utility headquarters without his permission.

Eventually, the dispute came to a head. In May 2005, the Plaintiff received a verbal warning for insubordination after she refused to reschedule a lunch meeting.

On January 20, 2006, City employees removed the Plaintiff's computer from her workstation, and she was required to surrender all City property, including keys and cell phone. The Plaintiff was placed on administrative leave and directed to work from home.

Todd Renfrow, General Manager of the Utility, had been informed by his immediate staff that the City's technology personnel had informed them that it appeared that the Plaintiff had attempted to access the user

and email accounts of Renfrow and other managers in the Utility.[2]  The alleged improper computer access was the reason for placing the Plaintiff on administrative leave, although the allegation was later found to be untrue.

Renfrow has stated that he was offended by what he believed the Plaintiff had done.  Renfrow believed that the Plaintiff's actions were a "serious inappropriate action."  However, neither Renfrow nor any other manager at the Utility ordered an investigation to determine conclusively that the Plaintiff had in fact attempted to access his user and email accounts.  No employee or agent of the City ever asked the Plaintiff about her computer use, and it appears that the Plaintiff was never informed of the reason why she was placed on administrative leave.

It has since been determined that the Plaintiff was merely attempting to book appointments with Renfrow and the other managers through the Microsoft Outlook program.[3]  At the time of his deposition

---

[2] Renfrow was told that the Plaintiff attempted to access the accounts of Jay Bartlett and Bill O'Rourke as well.

[3] Microsoft Outlook is a personal information manager computer program. Outlook provides email and calendaring functions to users.  Many organizations,

in 2009, Renfrow still believed that the Plaintiff had been trying to gain access to his email and user accounts.

While the Plaintiff was on leave, no investigation was carried out to determine if she had in fact engaged in wrongdoing.

Although, the Plaintiff's position had already been included in the budget for the upcoming year, Renfrow decided to eliminate her position. Renfrow could not lay off the Plaintiff on his own authority. As the appointing authority, Mayor Davlin could either ratify or reject Renfrow's decision. Renfrow discussed the matter with Davlin.

The following excerpt from Renfrow's deposition addresses discussions between Mayor Davlin and Renfow about the situation.

> Q:           And did you recommend to the Mayor that [the Plaintiff's] position be laid off?
>
> [Renfrow:]  I informed him that I had laid her off.
>
> Q:           Okay. So then the decision to lay her off was not one that the mayor had any input on?
>
> [Renfrow:]  No. He could have overruled me.
>
> Q:           Okay. Did you and he talk about the decision?

including the City, encourage workers to place work meetings on Outlook so that supervisors and co-workers are aware of scheduled events.

[Renfrow:]   I told him why I came to the decision.

Q:   And what did you tell him?

[Renfrow:]   I told him exactly what I've said here, the fact that I had contemplated for a long time that we did not have a need for that [position] and the fact that I felt that was in the best direction for the utility.

Q:   Did you tell him about her misuse of your computer?

[Renfrow:]   I'm sure I might have at some time.

Q:   So he was aware of that at the time of the decision?

[Renfrow:]   Well, I'm sure he was, but I'm not going to hold him to it.

Q:   Well, I'm not -

[Renfrow:]   Well, but you're asking me did I probably talk to him about it?  The answer is yes.  But, if I didn't, I'm not going to put him on the spot.

Q:   Well, you're not putting anyone on the spot.  I'm just asking for your recollections.

[Renfrow:]   My recollection is, yes, I probably discussed it with him.

Q:   And was that at the same time you told him you were laying [the Plaintiff] off?

[Renfrow:]   I don't recall that, when those two discussions, in what span, counselor.

Q:   Were they separate conversations?

[Renfrow:]   No.  I said I didn't know that.  I said the fact of when she accessed my computer and that it was probably around the same time.

| Q: | Let me ask this question. Did you tell the mayor that you had placed [the Plaintiff] in an administrative leave status? |
|---|---|
| [Renfrow:] | I'm sure I did. |
| Q: | And was that at the time she was placed in the administrative leave status? |
| [Renfrow:] | I believe so. |

Renfrow Dep. [d/e 45-5], at 81-83.

Ultimately, Mayor Davlin signed the layoff order and the letter informing the Plaintiff of the decision. The Plaintiff was informed on March 3, 2006 that she would be laid off, effective April 9, 2006.

Renfrow claims that he had harbored thoughts of eliminating the Plaintiff's position since within months of when he arrived at the Utility in early 2003. However, there is no indication that he ever spoke of this with anyone, and there is no documentation reflecting his claimed thoughts. Also, he has acknowledged that since the alleged inception of the idea until the Plaintiff was placed on administrative leave, the thought did not develop, and he never acted upon it.

The following excerpts from Renfrow's deposition are illustrative:

| Q. | What was in your mind at the time you placed her on administrative leave? |
|---|---|

| [Mr. Refrow:] | Well, first of all, I was offended that she tried to access my computer. . . |
|---|---|

. . .

| Q: | Okay. So at least by January - or by February, let's use that, 2006 you had been pondering for at least two years to eliminate her position? |
|---|---|

| [Mr. Renfrow:] | Correct. |
|---|---|

| Q: | And you finalized your decision to eliminate her position after you discovered she accessed your computer? |
|---|---|

| [Mr. Renfrow:] | Yes. |
|---|---|

. . .

| [Q:] | I don't want to confuse you. This is way too important. So let's go through it slowly, okay? Back during your first year as general manager you questioned the need for [the Plaintiff's] position. Am I correct? |
|---|---|

| [Mr. Renfrow:] | Correct. |
|---|---|

| Q: | And that continued through the end of 2005? |
|---|---|

| [Mr. Renfrow:] | Right. |
|---|---|

| Q: | Am I correct? |
|---|---|

| [Mr. Renfrow:] | Correct. |
|---|---|

| Q: | And the basis for your questioning the need for her position at the end of 2005 was the product of the same information you had when you initially came to that question or that thought. Am I correct? |
|---|---|

| [Mr. Renfrow:] | Right. |
|---|---|

| Q: | Nothing new had happened? |
|---|---|
| [Mr. Renfrow:] | No. |
| Q: | And on January 20, 2006, when [the Plaintiff] was placed on administrative leave, you still questioned the need for her position? |
| [Mr. Renfrow:] | Correct. |
| Q: | And you did that based upon the same information and the same thoughts you had back during your first year as general manager? |
| [Mr. Renfrow:] | Correct. |
| Q: | Nothing new had occurred? |
| [Mr. Renfrow:] | Correct. |
| Q: | What changed in your thought process?  What additional information did you receive other than your knowledge that [the Plaintiff] had accessed your computer by the time you made the decision to lay her off? |
| [Mr. Renfrow:] | I didn't have any new information.  I just went by my thoughts and a coincidence, whatever you want to say, and I decided at that time to lay her off. |
| Q: | Pure coincidence? |
| [Mr. Renfrow:] | That's got it. [*sic*] |

Renfrow Dep. [d/e 45-5], at 72, 73-74, 92-94.

As the General Manager, Renfrow was not involved in the day to day operation of the Utility.  Prior to eliminating the position, Renfrow

did not consult with any of the managers to determine if they thought

the position was necessary. No Utility employees recommended placing

the Plaintiff on administrative leave or separating her from service to the

City.

From joining the Utility in 2003 until the time of his deposition in

2009, Renfrow had never placed any other City employee on

administrative leave, nor had he laid off any other City employee.

## B. PROCEDURAL BACKGROUND

The Plaintiff did not contest the layoff before the Springfield Civil

Service Commission or file a grievance with the City.

The Plaintiff filed this action in November 2006, and the

Complaint contains eleven counts.[4] The Plaintiff alleged discriminatory

---

[4] **Count I:** against Defendant City on the basis of gender discrimination by an employer in violation of Title VII of the Civil Rights Act of 1964. **Count II:** against Defendant Seipel on the basis of violation of equal protection rights under 42 U.S.C. § 1983. **Count III:** against Defendant Bartlett on the basis of violation of equal protection rights under 42 U.S.C. § 1983. **Count IV:** against Defendant Renfrow on the basis of violation of equal protection rights under 42 U.S.C. § 1983. **Count V:** against Defendant Davlin on the basis of violation of equal protection rights under 42 U.S.C. § 1983. **Count VI:** against Defendant City on the basis of violation of equal protection rights under 42 U.S.C. § 1983. **Count VII:** against Defendant Seipel on the basis of violation of due process rights under 42 U.S.C. § 1983. **Count VIII:** against Defendant Bartlett on the basis of violation of due process rights under 42 U.S.C. § 1983. **Count IX:** against Defendant Renfrow on the basis of violation of

treatment by the Defendant City, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  The Plaintiff alleged constitutional torts under 42 U.S.C. § 1983.  Specifically, the Plaintiff made one claim against each defendant for violation of the Equal Protection Clause, and one claim against each defendant for denying her Due Process.

In October 2007, the Court entered an Opinion [d/e 13] partially granting the Defendants' Motion to Dismiss [d/e 10].  Specifically, the Court dismissed punitive damages claims against the City and the official capacity suits against Defendants Seipel, Bartlett, Renfrow, and Davlin, leaving only individual capacity suits against the four.  In addition, the Court denied the Defendants' request for qualified immunity.

## II. LEGAL STANDARD

"Summary judgment is appropriate when the evidence submitted, viewed in the light most favorable to the non-moving party, shows 'no

---

due process rights under 42 U.S.C. § 1983.  Count X: against Defendant Davlin on the basis of violation of due process rights under 42 U.S.C. § 1983.  **Count XI:** against Defendant City on the basis of violation of due process rights under 42 U.S.C. § 1983.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (quoting Fed. R. Civ. P. 56(c) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## III. ANALYSIS

### A. Section 1983 Claims Against the City

The Plaintiff has made two Section 1983 claims against the City, alleging violations of equal protection and due process rights. It is possible for municipalities to be held liable in Section 1983 actions under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). However, there are conditions that must be met.

A municipality can be liable for monetary damages under Section 1983 if the alleged unconstitutional action was "caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 588 F.3d 445, 453 (7th Cir.

2009).

The Plaintiff argues that Mayor Davlin is a City policymaker with regard to employment and personnel policies because he operates in these areas as an executive.[5]  The argument is not persuasive.

The City Council of Springfield is vested with the authority to make policy regarding human resources, not the mayor.  The City Council has the power to create or discontinue offices and departments within the City, and can expand or contract the powers of the Mayor through ordinances.  Springfield, Ill., Code of Ordinances § 31.20.  The City Council has the authority to pass all ordinances and rules necessary to carry out the powers under the statutes and constitution of Illinois.  *Id.* at  § 31.19.

Chapter 36 of the Code of the Code of Ordinances is entitled "Employment Policies" and establishes the framework for employment

---

[5] Plaintiff points out that under Illinois law, 65 ILCS 5/6-4-1 and 65 ILCS 5/6-4-7, Mayor Davlin: "a) appoints and removes officers and department heads of the City; b) controls all City departments; c) attends and takes part in meeting of the City Council; d) recommends measures for the adoption to the City Council; and e) enforces municipal laws and ordinances."  Pl.'s Mem. in Opp. to Mot. Summ. J. [d/e 39], at 59-60.

with the City.  In passing the ordinances contained in Chapter 36, the City Council reserved the right to modify the City's employment policies at any time.  Springfield, Ill., Code of Ordinances § 36.01.

It is apparent that the City Council is the organ that establishes the final human resources policy for the City.  The Mayor must operate within the framework that the City Council has established.

The U.S. Court of Appeals for the Seventh Circuit recently found an Illinois municipality subject to suit under Section 1983 based on the behavior of the mayor.  *Valentino v. Vill. of S. Chicago Hts.*, 575 F.3d 664, 679-680 (7th Cir. 2009).  However, the municipality in *Valentino,* South Chicago Heights, is a small suburban village where the mayor apparently had "unfettered discretion to hire and fire," and there was no evidence that the Village Board of Trustees ever passed any employment ordinances.  *Id.* at 677.

The human resources framework in Springfield is quite different from South Chicago Heights.  The City of Springfield has statutes, guidelines, and a comparatively elaborate civil service mechanism.  *See*

Springfield, Ill., Code of Ordinances Ch. 36.  The issue of final policy-making authority turns on this difference.  *Valentino*, 575 F.3d at 677-78.

Furthermore, it does not appear that the City Council delegated its policymaking authority to the mayor.

> Under the delegation theory, the person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions.  "There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire."

*Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009) (quoting *Kujawski v. Bd. of Comm'rs of Bartholomew County, Ind.*, 183 F.3d 734, 739 (7th Cir. 1999)).

Although the Plaintiff has shown that Mayor Davlin had the final say in the layoff decision, the Plaintiff has not shown that Davlin was delegated the authority to make layoff policy.  Therefore, the Court concludes that Mayor Davlin does not possess policy-making authority regarding employment matters.[6]

---

[6] The Plaintiff asserts that Mayor Davlin is "vested with the responsibility of participating in the formulation of the policies of the City, including, but not limited

The only way that the City could be held accountable for the alleged illegal conduct is if (a) Renfrow and Mayor Davlin were following City policy, or (b) the City Council ratified Mayor Davlin's decision, and the basis for it. *See Darchak*, 580 F.3d at 630.

Summary judgment for the City is warranted because any alleged improprieties regarding the layoff were not rooted in the policies of the City. *See Thomas*, 588 F.3d at 457 ("A governmental body's policies must be the moving force behind the constitutional violation before we can impose liability under *Monell*.").  Therefore, the City is immune to the Plaintiff's Section 1983 claims.

## B. Title VII Claim Against Defendant City of Springfield

Gender discrimination can be proven either directly or indirectly. *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1044 (7th Cir. 2000).

### 1. Direct Method

---

to, its employment and personnel policies."  Being vested with the "the responsibility of participating in the formulation of [policy]" is not the same as being vested with policymaking power.  Many participate in the policy-making process, but that is a far cry from having the *power to adopt policies*.

The Plaintiff has asserted that she can show discrimination via the direct method. There are two ways that discrimination can be proven via the direct method: direct evidence and circumstantial evidence.[7] *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008).

### a. Direct Evidence

Direct evidence is evidence that, if believed by the trier of fact, shows discriminatory conduct without relying on inference or presumption. *Lewis v. School Dist. # 70*, 523 F.3d 730, 742 (7th Cir. 2008). "[D]irect evidence essentially requires an admission by the decision maker that his actions were based on the prohibited animus and so is rarely present." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)(internal quote marks omitted).

The Plaintiff has not alleged that any of the Defendants have admitted that gender bias played a role in the loss of the Plaintiff's employment. Therefore, the Plaintiff cannot prevail under the direct

---

[7] Although paradoxical, circumstantial evidence can be used in the direct method. *See Hasan*, 552 F.3d at 527 ("Despite its name, proof of discrimination under the direct method is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion.") (quotation marks and citation omitted).

evidence prong of the direct method.

### b. Circumstantial Evidence

The circumstantial evidence must point directly to a discriminatory reason for the employer's action. *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 829 (7th Cir. 2007). Just like direct evidence, it shows discrimination "albeit through a longer chain of inferences." *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006). It must be of sufficient strength that a jury could infer intentional discrimination by the decision-maker. *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003).

The Plaintiff contends that a reasonable jury could conclude that when the Plaintiff was transferred to the 10th and Miller Street facility the key accounts program was to become eventually a two person job, and that when the Plaintiff was separated, a male (Workman) continued working with key accounts for a period of time.

The Plaintiff states that Workman took on significant key accounts duties and was deeply involved. The Plaintiff stresses that the City never

indicated a flagging interest in key accounts.

Workman's role as her supervisor undercuts the Plaintiff's characterization of key accounts activities. His intense involvement in key accounts derived from his position as supervisor of the Plaintiff, and his unique management style. There are uncontroverted statements in the record that Workman became involved at a low level in key accounts on his own initiative, and not on the direction of his superiors.

The Plaintiff's arguments for circumstantial evidence do not provide a sufficient basis for a reasonable jury to infer intentional discrimination.

## 2. Indirect Establishment of Discrimination

For the Plaintiff's discrimination claims to survive summary judgment by the indirect method, she must prevail under the burden-shifting regime established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).

The Plaintiff must first establish a prima facie case of gender discrimination: (1) that she is a member of a protected class, (2) that she

was meeting legitimate employer expectations, (3) that she suffered an adverse employment action, and (4) that similarly situated males were treated better. *See Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 364 (7th Cir. 2009).

If the Plaintiff can make a prima facie case, then the burden shifts to the City to show a legitimate non-discriminatory reason for the employment action. *Id.* at 364-65. If the City is able to make this showing the Plaintiff must be able to show that the legitimate non-discriminatory reason is a pretext. *Id.* at 365.

### a. The Prima Facie Case

A plaintiff bears the burden of establishing a prima facie case of discrimination by the preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

It is undisputed that the Plaintiff is a member of a protected class and that losing her job was an adverse employment action.[8]  Therefore,

---

[8] There has been some discussion in the briefs regarding whether the treatment the Plaintiff received in the final portion of her time with the Utility (such as moving

the two remaining prongs of the test will be examined.

### i. Treatment of Similarly Situated Employees

A complaining employee must show that the similarly situated individual (who was treated more favorably) is directly comparable in all material respects.  *See Atanus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008).

The United States Court of Appeals for the Seventh Circuit has repeatedly stated that when evaluating whether two employees are comparable, a court must look to the relevant factors, including whether the employees: (1) held the same job description; (2) were subject to the same standards; (3) dealt with the same supervisor; and (4) had comparable experience, education, and other qualifications.  *See, e.g., Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009).

The Plaintiff has alleged that Workman was a similarly situated employee, and that he was treated better.  The Plaintiff's argument fails.

---

to the 10th and Miller Street facility or the management style of Workman) constituted an adverse employment action.  The Plaintiff has explicitly stated that her gender discrimination claim is focused solely on the layoff, and not working conditions during that period.

First, they did not have the same job description, although the Plaintiff has attempted to focus on the fact that they were both project managers. In determining whether another employee is similarly situated, the existence of an equal title does not mean that the employee had equal responsibilities. *Ford v. Minteq Shapes and Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009).

As mentioned above, the primary responsibilities of the Plaintiff and Workman were different. Although some cross-training occurred, it did not mean that they had the same job.

Second, Workman was the Plaintiff's supervisor. Therefore, they did not both report to the same supervisor. The fact that one employee has supervisory responsibilities and the other has no supervisory responsibility strongly suggests that they are not similarly situated, especially when one supervises the other. *See Dear*, 578 F.3d at 610.

Third, although they both had decades of working with utilities, they had different experience and training. Workman was focused on operational and commercial issues while the Plaintiff had spent her career

working with electrical power marketing and overseeing key accounts. Workman also had more supervisory experience.

The purpose of the similarly situated test is to be able to hold constant the variables between employees, such that a plausible explanation for choosing one over the other is membership in a protected class.

In the case at bar, the Plaintiff and Workman cannot be adequately compared. A supervisor and a subordinate are not similarly situated.

### ii. Legitimate Employer Expectations

The Court notes at the outset that the unique management style of Workman most likely contributed to some of the workplace friction, and that some of Workman's expectations were unreasonable.

The Defendants have detailed an extensive list of the Plaintiff's failings and errors. The Plaintiff has responded by contesting a number of the charges. The Court does not see fit to analyze each of these contested occupational peccadilloes.

What remains is one disciplinary issue. The Plaintiff was given a

verbal warning when she refused to reschedule a lunch meeting to accommodate Workman's schedule. In the pleadings the Plaintiff claims that the meeting was a "personal luncheon with friends."

However, the record does not support the Plaintiff's assertion regarding the lunch. The meeting was posted on the Plaintiff's work calendar, the meeting was about utility deregulation, and the attendees were employees of another utility. Apparently the Plaintiff used Renfrow's membership information to hold the meeting at the Sangamo Club, in downtown Springfield.[9] The purpose of the meeting was to glean information, and the Plaintiff told Workman that she would report what she found out at the meeting.

The Plaintiff bears the burden of establishing the prima facie case by the preponderance of the evidence. The Plaintiff has not established that she was meeting her employer's legitimate expectations.

Ultimately, the Plaintiff's claim cannot proceed under the indirect method, because the Plaintiff can only establish two of the four prongs of

[9] Renfrow allowed the Plaintiff to use his membership in clubs to meet with individuals from other utilities and key accounts.

the prima facie case.

Accordingly, summary judgment is appropriate for the City on the Title VII claim because the Plaintiff's claim fails under both the direct and indirect methods.

### C. Section 1983 Claim - Equal Protection

The same standards for proving intentional discrimination apply equally to both Title VII and Section 1983 actions. *Williams v. Seniff*, 342 F.3d 774, 788-89, n. 13 (7th Cir. 2000). Therefore, the Title VII analysis above applies to the equal protection Section 1983 claims. Consequently, all Defendants will be granted summary judgment on the equal protection Section 1983 claims.

### D. Due Process Claims

#### 1. Layoff or Firing?

The Plaintiff has alleged that her separation from the City was in fact a "for cause" termination, dressed up as a reorganizational layoff. Municipalities are not allowed to "use a [reduction in force] to conceal a for-cause dismissal and thereby deprive a career employee of the

procedural protections to which [s]he would otherwise be entitled."
*Lalvani v. Cook County, Ill.*, 269 F.3d 785, 793 (7th Cir. 2001). The
principle expressed in *Lalvani* applies equally to "reorganizational layoffs"
where only one position is eliminated under suspicious circumstances.

The Defendants have argued that the Plaintiff has not adequately
alleged an illegitimate layoff because the allegation is not identical to the
quintessential "sham layoff." A "sham layoff" is when one or more
workers are laid off, and then shortly thereafter cronies are hired to fill
the positions.

The Defendants argue that the Plaintiff's separation from the City
was per se legitimate because her job duties were diffused among several
employees. The Court does not agree.[10]

Although there may be some "classic" types of illegitimate layoffs,
past practice hardly precludes the development of more forms of
improper layoffs.

---

[10] According to the Defendants, a court's inquiry should automatically end
when it is determined that job duties were subsequently performed by others. Under
the Defendants' theory, a municipality could freely terminate employees for cause
without process, as long as former coworkers were willing to pick up the slack.

Subtlety and deception are inherent in an improper layoff. Therefore, a wily public official would be foolhardy to engage in conduct which has been universally declared prima facie evidence of an unconstitutional layoff. Instead, the official would seek to cover his tracks more carefully.

Illegitimate layoffs can take many forms because, while there is generally one way to do something legitimately, there are myriad ways to perform a task illegitimately. *Cf.* Leo Tolstoy, *Anna Karenina* 1 (C. Garnett trans. 1933) ("[h]appy families are all alike; but every unhappy family is unhappy in its own way").

Courts are not prohibited from using common sense. *See, e.g., Lake v. Neal*, 585 F.3d 1059, 1059 (7th Cir. 2009) (applying "Duck Test:" "if it walks like a duck, swims like a duck, and quacks like a duck, it's a duck").

Experience teaches that placing an employee on administrative leave for perceived inappropriate conduct is often a precursor to termination for cause. In this case, the Plaintiff was wrongly presumed

culpable of computer malfeasance. No investigation was undertaken to determine the veracity of the suspicions.

The Plaintiff sat in limbo, assigned to her home after relinquishing all City property. Eventually, she was informed that her position was being eliminated and that she would be laid off. The Defendants claim the events are unrelated.

Common sense indicates that there is something fishy here. *See McGreal v. Ostrov*, 368 F.3d 657, 681 (7th Cir. 2004) ("when we are drawing all reasonable inferences in favor of the party opposing summary judgment, the Village's *post hoc* explanation sounds too fishy to support judgment"). Renfrow's assertion that the proximity and sequence of the events was coincidental is "too convenient" to allow summary judgment for the Defendants. *See Valentino*, 575 F.3d at 673-74. The timing of these events provides a genuine issue of fact regarding the true reason for the Plaintiff's separation. *See McGreal*, 368 F.3d at 681.

A reasonable jury could find that the Plaintiff's separation was in fact a termination, rather than a layoff.

## 2. Notice and Hearing

### a. Standards

The parties agree that the Plaintiff had a protected property interest in her public employment.  If the Plaintiff was terminated for cause, she would be entitled to pre- and post-deprivation hearings to contest the termination.

The parties agree that if the Plaintiff was laid off as part of a legitimate layoff, she would not be entitled to the same procedural protections as if she was terminated.  If the Plaintiff was separated via a legitimate layoff, it appears she received sufficient process.

The question is whether the Plaintiff was afforded sufficient process if her separation was in fact a termination for cause.

The basic test for due process was set out in *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).  The Seventh Circuit summarized the *Mathews* test in *Lalvani*:

> The flexible approach to due process adopted in *Mathews* requires us to weigh the significance of the private interest at issue and the risk of an erroneous deprivation of that interest under the procedures employed by the state, against the probable benefits of any additional procedural protections and the state's interest in avoiding the fiscal and

administrative burdens that those additional protections would impose.

*Lalvani*, 269 F.3d at 793 (citing *Mathews*, 424 U.S. at 335).

Although the *Mathews* test is often used in due process cases, the Court believes that it would not be very helpful in this case.

In the case at bar, it appears that the parties would agree that the existing procedures for layoffs are adequate for a legitimate layoff, and that procedures for terminations are adequate for a real termination. While each of these "tracks" is adequate, the Plaintiff argues she was placed on the wrong "track" when her separation was characterized as a layoff.

*Mathews* is useful in determining if existing procedures are likely to avert a deprivation, and if there are low cost alternatives that could easily be implemented. So, the test in *Mathews* helps when evaluating due process in a given "track," but not so much when comparing across "tracks."

Therefore, the Court will examine this issue under *Cleveland Board of Education v. Loudermill*, a case which relied on *Mathews* to determine

required process for public employees.[11]  In *Loudermill*, the Supreme

Court stated the following regarding due process required for public

employees:

> The essential requirements of due process . . . are notice and an
> opportunity to respond.  The opportunity to present reasons, either in
> person or in writing, why proposed action should not be taken is a
> fundamental due process requirement.  The tenured public employee is
> entitled to oral or written notice of the charges against him, an
> explanation of the employer's evidence, and an opportunity to present
> his side of the story.

*Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 546 (1985) (citations

omitted).

The Defendants claim that even if the separation was in reality a

for cause termination, sufficient process was available to the Plaintiff

through either the grievance process or the Springfield Civil Service

Commission.  The Court disagrees.

> *b. Notice*

---

[11] If the Court were to use *Mathews*, the Plaintiff probably would prevail. Applying the *Mathews* factors, the Plaintiff had a strong interest in retaining her job. Assuming the Plaintiff was terminated for perceived misconduct, the likelihood of an erroneous deprivation was very high under the procedures used by the Defendants. (The Plaintiff has now been exonerated of any wrongdoing regarding email and user accounts.)  The additional procedure needed to remedy this would have been low-cost: informing the Plaintiff of the allegations against her.

Under *Loudermill*, an individual must not solely be given the option of a hearing, but also notice. That notice must include the charges and the employer's evidence. In this case, it is established that the Plaintiff did nothing wrong and she was told she would lose her job because her position was eliminated. If the Plaintiff was in fact separated for cause, she did not have adequate notice.

Although there may have been an administrative body to hear her complaint, what could she tell them? Denying an individual notice of the allegations means that she can go before the administrative body, but she cannot refute the charges because she has not been told what they are. *Cf.* Franz Kafka, *The Trial* (1925).

The Plaintiff would not have been able to guess she was suspected of computer malfeasance. The Plaintiff merely tried to book an appointment through Outlook. There is no reason why she would suspect this was the cause of her placement on administrative leave or separation.[12]

---

[12] In fact, it appears that it was only through discovery the Plaintiff was able to learn the reason for her placement on administrative leave.

*c. Hearing*

The Defendants' claims that the Civil Service Commission or the grievance process provided an opportunity to be heard are not entirely persuasive.

First, the Defendants mistakenly state that both avenues were available to the Plaintiff. In fact, the two remedies are mutually exclusive. "The grievance provisions of this section shall not apply to any matters which can be subject to the jurisdiction of the civil service commission." Springfield, Ill., Code of Ordinances § 36.62(a)(2). Therefore, the Plaintiff could not have pursued both.

The Plaintiff may have been able to obtain a hearing before the Civil Service Commission if she filed a complaint. Springfield, Ill., Code of Ordinances § 36.30; Rule 1.9, Rules of the Springfield Civil Service Commission. However, the authority for that very general process derives from a catch-all provision that provides little guidance to the Commission. Springfield, Ill., Code of Ordinances § 36.30. The Civil Service Commission complaint procedure the Defendants point to is so

broad that even upset taxpayers can use it. Rule 1.9, Rules of the Springfield Civil Service Commission.

Furthermore, it does not appear the grievance process would have afforded the Plaintiff an opportunity to a fair hearing. Under the grievance procedure, an aggrieved employee can present her claim to successively higher ranking City officials. The grievance is initially lodged with the immediate supervisor, then department head, followed by the director of human resources, and finally the appointing authority. Springfield, Ill., Code of Ordinances § 36.62(d). In this case, the person with final decision-making authority regarding the grievance would be Mayor Davlin.

The Defendants state that even if the Plaintiff was separated through an illegitimate layoff, the grievance process would have been adequate. It is difficult to comprehend how the Plaintiff could have a fair hearing from an official accused of participating in the deprivation.

Therefore, if the Plaintiff's separation from the City was in reality a for cause termination, the Defendants cannot show that she was afforded

both notice and an opportunity to respond.  The Plaintiff had virtually no notice, and the Defendants' showing of an opportunity to be heard is not terribly strong.

### 3. Renfrow's Plans

Renfrow claims he had thought about eliminating the Plaintiff's position for a number of years.  Although Renfrow made his statements under oath regarding his thoughts, a jury needs to determine credibility.

Self-serving testimony can be used to obtain summary judgment, as long as the statement is based on personal knowledge and observation. *Whitlock v. Brown*, — F.3d —, 2010 WL 624307, at *4 (7th Cir. 2010) (citing *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)).  However, the testimony in question relates to the internal mental processes of Renfrow, and he is the only person who knows what his thoughts were. Mental impressions are not observable.

It is impossible for a party to refute claims regarding the thoughts of others, and requiring that in summary judgment proceedings would be manifestly unfair to the non-moving party.  Ultimately, a jury should

make a credibility determination regarding Renfrow's claims.

Furthermore, if Renfrow did in fact entertain these thoughts, that alone is not enough to obtain summary judgment. The seriousness of the thoughts, and the extent to which the claims regarding computer access provided the impetus for the separation are relevant in determining the claim. Even if Renfrow had long harbored these thoughts, it is unclear the extent to which the untrue allegations against the Plaintiff were part of the calculus. This is a question of material fact. Accordingly, the Defendants will not be granted summary judgment on the due process claim.

### E. Sufficient Involvement to Incur Section 1983 Liability

Mayor Davlin has claimed that he cannot be held liable under Section 1983 on the Due Process claim because he was not sufficiently involved in the layoff of the Plaintiff.

A plaintiff cannot prevail in a Section 1983 action against a supervisor in an individual capacity on a respondeat superior theory. *Doyle v. Camelot Care Ctrs.*, 305 F.3d 603, 614 (7th Cir. 2002).

"Rather, the supervisory officials must have had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *Id.* at 614-15.

Mayor Davlin has argued that he had no involvement in the alleged due process violation, claiming he was not involved in the decision making process regarding the imposition of administrative leave and the layoff. Davlin has asserted that he merely participated as the Appointing Authority for the City.

The Defendants have asserted that "[j]ust because Mayor Davlin knew of Mr. Renfrow's decision to lay off the Plaintiff does not demonstrate that Davlin was involved in the decision or was aware of any specific facts surrounding the layoff nor was he aware of any alleged deprivation of the Plaintiff's constitutional rights." Defs.' Reply [d/e 49] at 25.

However, as established from the deposition excerpts above, Renfrow and Mayor Davlin apparently did discuss the placement of the Plaintiff on administrative leave for perceived attempts to access

Renfrow's computer and email accounts. Davlin and Renfrow did discuss the purported rationale for the separation. Therefore, Mayor Davlin was aware of the surrounding events.

Although Renfrow may have made an initial determination regarding the layoff, Mayor Davlin had to approve the decision for it to take effect. Mayor Davlin had the authority to block Renfrow's action. Davlin's signature appears on the letter informing the Plaintiff of the separation. Defs.' Ex. 42 [d/e 39-4]. Mayor Davlin also signed the layoff order. Defs.' Ex. 43 [d/e 39-4]. Without Davlin's authorization and signature, the Plaintiff would not have been laid off.

It is important to remember the Plaintiff's claim. The Plaintiff alleges that she was laid off because she was suspected of trying to get into the accounts of Renfrow and others. The Plaintiff asserts that this violates her due process rights because it was a way for the Defendants to end her employment without having to prove the allegations (of which she was innocent). Therefore, the operative act that allegedly deprived the Plaintiff of her due process rights was the layoff, which was carried

out by Mayor Davlin.  The allegation is not merely that a manager decided to lay her off; it is that she was laid off.  Mayor Davlin was involved in the alleged deprivation.

It is irrelevant that Mayor Davlin did not participate in Renfrow's decision-making.  Davlin made his own decision to approve the layoff.  Without Davlin's decision this case would not exist, because the Plaintiff would not have been separated from the City.

Mayor Davlin has raised what could be called the "rubber stamp defense."  He essentially claims that his duty was to blindly approve any action that crossed his desk.  Davlin argues that because he approves the actions of others, he has no liability for any illegal actions that he approved.  Mayor Davlin's argument is without merit.

The Court finds that Mayor Davlin was sufficiently involved in the layoff to face possible liability under Section 1983.

### F. Qualified Immunity

Renfrow and Mayor Davlin have invoked qualified immunity, and the Court must determine whether they enjoy qualified immunity on the

due process claims. The Court must determine two issues: (1) whether the facts alleged, taken in the light most favorable to the Plaintiff, show that the officer's conduct violated a constitutional right, and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Although the Court need not answer the questions in that order, it will do so in this case. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

### 1. Violation of a Constitutional Right?

Viewing the facts in the light most favorable to the Plaintiff, the unlawfulness of what the Plaintiff has alleged is apparent. The Seventh Circuit has stated government employers cannot "use a [reduction in force] to conceal a for-cause dismissal and thereby deprive a career employee of the procedural protections to which [s]he would otherwise be entitled." *Lalvani*, 269 F.3d at 793. The Plaintiff's due process allegations regarding her separation fall under *Lalvani*.[13]

---

[13] The Defendants have tried to muddy the waters on qualified immunity by discussing irrelevant issues, such as the way her work was scrutinized. These are not part of the Plaintiff's claim. The Defendants make only a superficial qualified immunity claim on the layoff, contending generically that they are immune because the layoff was legitimate.

## 2. Was the Right Clearly Established?

To be shielded, an official must show that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Supreme Court subsequently clarified the clearly established standard:

> The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted).

In making this determination, the Court views the facts in the light most favorable to the Plaintiff. Reasonable public officials know that it is illegal to discharge a subordinate for perceived misconduct under the guise of a layoff.

Renfrow's actions were contrary to clearly established rights. A reasonable public official would find the illegality of Renfrow's actions

not merely apparent, but obvious and inescapable.

Mayor Davlin's actions are a somewhat closer call. Although Davlin did not start the process leading to the Plaintiff's loss of employment, he gave his approval.

Renfrow testified in his deposition that he was sure that Mayor Davlin was aware of the decision to place the Plaintiff on administrative leave. Renfrow further testified that he "probably" told the Mayor that Utility officials had concluded that the Plaintiff had attempted to access the user and email accounts of Renfrow and others. Viewing these statements in the light most favorable to the Plaintiff, the Court assumes that Mayor Davlin knew of the accusations against the Plaintiff and that she had been placed on administrative leave.

A reasonable public official knows that under the following circumstances a layoff would violate the law:

> (1) a mayor has a conversation with a department manager who discusses how an employee attempted to access his email and user accounts;
>
> (2) the manager places that employee on administrative leave, the only time he has ever done so while employed by the City; and

(3) less than two months later, while the accused employee is still on leave, the manager comes to the mayor and seeks to eliminate the accused's job.

A reasonable public official in Mayor Davlin's position would recognize that the proposed action would violate the accused employee's rights. In spite of this, Davlin ordered the layoff.

Therefore, the Court concludes that Renfrow and Mayor Davlin are not entitled to qualified immunity.

## G. Summary Judgment for Defendants Bartlett and Seipel

The Defendants have moved for summary judgment for Defendants Greg Seipel and Jay C. Bartlett. The Plaintiff has conceded that they were not materially involved in her separation and that they should not be part of the case. Therefore, summary judgment will be granted to Seipel and Bartlett.

## IV. CONCLUSION

Ergo, the Defendants' Motion for Summary Judgment [d/e 39] is ALLOWED IN PART and DENIED IN PART.

The Defendants' Motion is ALLOWED with respect to the

following claims:

> (1) Judgment is hereby entered in favor of Defendants Bartlett and Seipel and against the Plaintiff on all claims.

> (2) Judgment is hereby entered in favor of Defendant City of Springfield and against the Plaintiff on the Title VII claim.

> (3) Judgment is hereby entered in favor of Defendant City of Springfield and against the Plaintiff on all Section 1983 claims.

> (4) Judgment is hereby entered in favor of Defendants Davlin and Renfrow and against the Plaintiff on the equal protection Section 1983 claims.

The Defendants' Motion is DENIED with respect to the individual capacity due process Section 1983 claims against Defendants Davlin and Renfrow.

IT IS SO ORDERED.

ENTER: March 26, 2010

FOR THE COURT:                    s/Richard Mills
                                  United States District Judge